426 P.2d 404

**SARWARK MOTOR SALES, INC., an Arizona corporation, Standard Accident Insurance Company, a foreign corporation, Appellants,**

v.

**Thomas HUSBAND, Appellee.**

**No. I CA–CIV 253.**

Court of Appeals of Arizona.

April 11, 1967.

Rehearing Denied May 2, 1967.

Review Denied June 13, 1967.

Minne & Sorenson, by Joe W. Contreras, Phoenix, for appellants.

Charles Christakis, Phoenix, for appellee.

STEVENS, Judge.

This is an appeal from a judgment awarding the plaintiff, Thomas Husband, $750 actual damages and $2,000 punitive damages in connection with the purchase and sale of a used car. This Court also has for its consideration a cross-appeal urging that the trial court erred in ordering a remittitur, the plaintiff (cross-appellant) having accepted the remittitur.

The plaintiff sued Sarwark Motor Sales, Inc., an Arizona corporation, herein called the defendant; John Doe Webb who was not served with a complaint and summons and who made no appearance in the action; and the defendant's surety on its dealer's license bond, the Standard Accident Insurance Company, a corporation. The gravamen of the complaint charges a fraudulent misrepresentation as to the number of miles the car had been driven. The defense urges insufficiency of proof and a contract negating warranties. There are other matters urged on the appeal. The cause was tried to a jury which returned separate verdicts for $750 actual damages and $5,000 punitive damages. A judgment was entered in conformity with the verdicts. The record discloses that the defendant and surety adequately protected their record and after the entry of the judgment for $5,750, the defendant and surety moved for a judgment notwithstanding the verdicts or, in the alternative, for a new trial. The trial judge ordered a remittitur of $3,000 specifying that in lieu thereof a new trial would be granted. The plaintiff filed a remittitur and the judgment was reduced to the sum of $2,750. The defendant and its surety perfected a timely appeal and the plaintiff filed a timely cross-appeal. The cross-appeal urged error in ordering the remittitur.

At the oral argument, inquiry was made of plaintiff's counsel as to the effect of the recent case of State ex rel. Herman v. Tucson Title Insurance Company, 101 Ariz. 415, 420 P.2d 286 (1966). In this case the defendant, Tucson Title, filed a cross-appeal in relation to an order

of remittitur. In the opinion, the Arizona Supreme Court stated:

"* * * the defendants acknowledge that prior Arizona cases * * * have held a party who was awarded damages and accepted a remittitur in accordance with the trial court's order was estopped to attack the remittitur on cross-appeal. * * * Though a remittitur may have as one objective the obviating of a new trial, it does not necessarily prevent the defendant from taking an appeal. We decline to depart from the well-established rule in Arizona."

Plaintiff's counsel urged that the last cited case is not appropriate for the reason that the rule therein set forth was not urged in defense of the cross-appeal. In view of the clear statement of the Arizona rule that a party who accepts a remittitur is "estopped to attack the remittitur on cross-appeal", it is our opinion that the propriety of a cross-appeal of this nature can be raised for the first time in the appellate court, even on the court's own motion. We hold that we cannot entertain the cross-appeal.

█ In considering the appeal we must view the record in the light most favorable to sustaining the verdicts and the judgment. Truck Insurance Exchange v. Hale, 95 Ariz. 76, 386 P.2d 846 (1963); Shell Oil Company v. Collar, 99 Ariz. 154, 407 P.2d 380 (1965); Snyder v. Beers, 1 Ariz.App. 497, 405 P.2d 288 (1965); Gee v. Salcido, 2 Ariz.App. 280, 408 P.2d 42 (1966). Following this admonition, the record discloses that the plaintiff was interested in purchasing a used 1958 Buick to replace the 1953 Buick he then owned. The plaintiff was a line-haul driver for freight lines. While denying that he was a skilled mechanic, he admitted that he personally performed most of the maintenance on cars which he owned including the car in question. He maintained a detailed record relative to any car which he personally owned.

Mr. Johnston, not a party to the action, testified for the plaintiff. On or about 20 November 1962, having recently purchased another car, Johnston desired to sell his 1958 Buick Roadmaster for cash. In 1958 Johnston purchased the Buick which had been driven as an executive car. At the time of Johnston's purchase the car had been driven about 4,000 miles. Under these circumstances, the Buick could be considered a "one-owner" car at the time he was ready to sell it in November 1962. Johnston visited one or two used car lots before calling at the defendant's lot where he sold the car to the defendant for $950 cash.

The trial which eventually lead to this appeal was held in April 1965. Johnston testified that he did not pay careful attention to the mileage reading on the speedometer and that he made no note as to the reading at the time of the sale of the defendant. He further testified that the car was well cared for and that throughout his ownership he had the car serviced regularly every 1,000 miles. His testimony disclosed that twice during his ownership repairs had been made to the speedometer, these repairs being necessary in relation to the accuracy of the speed indication. He had no trouble with the mileage registration. He testified that he had no recollection that the speedometer had ever been turned back and that at the time of the sale of the car to the defendant, it had been driven in excess of 80,000 miles, possibly 85,000 or 86,000 miles. The actual transaction whereby Johnston sold the car to the defendant was negotiated by Johnston with Mr. Sarwark, hereinafter referred to as Sarwark, the President of the defendant.

In the defendant's used car advertisement, which appeared in the 9 December 1962 Sunday paper, the following appeared:

"'58 BUICK                    SAVE Roadmaster 75 4–door Hardtop. Fully equipped with every conceivable extra including factory refrigeration. *Very low mileage* local car. It is hard to believe that a '58 model car could be taken care of so nicely. As clean as a '63 model. Serviced regularly at a local Buick dealer." (Emphasis supplied)

The plaintiff read the ad and he and his wife went to the used car lot of the defendant, where they were met by the defendant's salesman Webb. There was testimony that Webb was employed by the defendant as a salesman from September 1962 to 14 December 1962. The plaintiff asked to see the car which had been advertised in the above quoted advertisement and Webb showed him the car in question. Both the plaintiff and his wife specifically inquired as to the accuracy of the mileage appearing on the speedometer and they testified that Webb told them that the reading was the same as when the car had been brought to the lot, and that it was against the law to turn back the mileage reading on speedometers. The car was inspected by the plaintiff and his wife, they took the car for a short test drive and upon returning to the defendant's used car lot, a purchase contract for the sum of $1,-441.33 was signed. Webb did not participate in the preparation or the signing of the contract. The purchase price was paid as follows: $100 by a trade-in, $300 by a check, $1000 by financing arranged with one of the finance companies on the following day, and a check for $41.33 which was delivered to the defendant at the time the car was delivered to the plaintiff on the following Monday evening. It was then that the plaintiff recorded the mileage, his testimony being that the speedometer showed 22,836 miles.

The plaintiff admitted that he did not read all of the contract contenting himself with the examination as to the monetary terms. The contract is a short one without "fine print". The terms of the contract, crucial to this case, are quoted:

"'As Is' Form

"I hereby offer to buy from SARWARK MOTOR SALES, INC. * * *

"On the basis set forth below:

   *    *    *    *    *    *

"I offer the above proposal subject to SARWARK MOTOR SALES, INC., acceptance and all the terms of the proposal are set forth herein. * * *

"The above car is positively told as registered and you make no warranty as to year model, mileage, or condition.

   *    *    *    *    *    *

"AS IS—NO GUARANTEE

This automobile carries no warranty whatsoever, being delivered positively as is."

■ Shortly after taking delivery of the car, the plaintiff made inquiry of the former owner as to the type of oil which had been used in the car. He then learned that the mileage appearing on the speedometer was not the true mileage. He demanded of Sarwark the right to rescind the agreement and this right was refused. The plaintiff still owned the car at the time of trial and testified as to maintenance problems which had developed with the car during his period of ownership, being the type of problems one could expect from a car which had been driven many miles even though properly cared for. He testified that the low mileage was "the sole reason" that he bought the car, admitting however, that the apparent general good condition of the car was also a factor. He stated that had the car been "a dog" he would not have purchased it even had the mileage shown on the speedometer been correct. The plaintiff, as the owner, testified as to the difference in value as of the date of purchase if the car had been driven only 22,836 miles as against the same car if it had been driven 86,000 miles. As an owner he was qualified to so testify. Murphy v. State, 50 Ariz. 481, 73 P.2d 110 (1937); Spector v. Spector, 94 Ariz. 175, 382 P.2d 659 (1963).

■■ The difference in value as of the date of purchase was the measure of damages under the "benefit of the bargain" rule which applies in Arizona. Packard Phoenix Motor Company v. McRuer, 41 Ariz. 450, 19 P.2d 332 (1933); Steele v. Vanderslice, 90 Ariz. 277, 367 P.2d 636 (1961). The appellants attack this testimony urging that cross-examination disclosed an insufficient basis for his opinion

as to value. This attack goes not to the admissibility but to the weight of the testimony. The $750 verdict for actual damages was within the value difference testified to by the plaintiff.

Webb did not testify. The testimony of the plaintiff and his wife as to Webb's statements in relation to the true mileage of the car was not challenged by other testimony. Johnston's testimony as to the probable speedometer reading at the time of the sale of the car to the defendant was not challenged by Sarwark who did not testify.

Two of the defendant's employees testified, Mr. Sebert, the Secretary, General Manager and Office Manager of the defendant and Mr. Milner, the Salesmanager of the defendant. It was established that Sarwark was the chief executive officer of the defendant, that Sebert was next in the chain of executive responsibility and that Milner was third in command. It was established that Sarwark was completely responsible for the content of all advertising.

Sebert was asked what the defendant company meant by the term "Very low mileage" and responded:

"A  It could mean up to 500,000."

This was followed by:

"Q  500,000 to you folks would be very low mileage, is that what you're telling this jury? Very low mileage could be up to 500,000?

"A.  I am not telling the jury, I am talking to you.

"Q  Tell the jury.

"A  No, I'd rather talk to you. You are asking the questions. I don't know what a low mileage car is. It says 'low mileage'. It doesn't specify any mileage at all, does it?"

When pressed for a further explanation, the witness testified:

"A.  It could be a 50,000 mile car. That's a nice low mileage car. * * *"

He further testified that when the defendant buys cars the mileage is not important, that the mileage is immaterial.

Milner was unable to give a concise definition of the term "very low mileage" when inquiry was made with reference to a 1958 vehicle in December of 1962. He answered:

"A  Probably 33, 35,000."

This statement was followed by:

"Q  How about 86,000 miles? Would that be a very low mileage, or would that be a high mileage?

"A  That would be a high mileage."

He also verified that when the defendant purchased an automobile, " * * * I never do consider the mileage. I consider the car itself." His testimony reflects the following statement:

"A  If I am appraising the car, and one has 22,000, and the other has 86,000, and if they both drive the same, I would pay equal money for each car. The mileage has no bearing on it."

He acknowledged that the defendant made no record as to the mileage registered on any of their cars. We find the further testimony:

"Q  * * * An ordinary person coming in, they want to know how many miles it has been driven, isn't that a usual question to be asked?

"A  I would say maybe 50 per cent of the people would ask if it was the original miles.

"Q  Yes, because that's important to a person coming in to buy one of your used cars, and I am not talking about car dealers.

"A  Yes.

"Q  Do you know why it is important to them to find out how many miles a car has been driven?

"A  I do.

"Q  Why?

"A  Well, they figure the lower the mileage the better the condition."

Further testimony reveals the following:

"Q. * * * Isn't that the purpose of an ad like that 'Very low mileage'? Isn't that for attracting prospective customers?

"A Yes.

"Q Thank you. And if your corporation puts an ad like that in, they would hold out to the public that this a true statement, that the car had very low mileage, isn't that true?

"A That is true.

   *   *   *   *   *   *

"Q If the corporation that you work for puts an ad in the paper and say 'Very low mileage', wouldn't they expect a guy who came in to buy it to rely on that statement that it was true?

"A Yes. "

The representatives of the defendant testified that the defendant does not make a record of speedometer readings in relation to automobiles purchased by the company and that during the year 1962, the company sold approximately 2400 used cars.

■ It is clear that in the absence of fraud, the parties are free to negative warranties by contract. Min–A–Con Equipment Co. v. T.M.K. Construction Co., 102 Ariz. 24, 424 P.2d 152 (1967).

■ It is well established that fraud must be proven by clear and convincing evidence, Rice v. Tissaw, 57 Ariz. 230, 112 P.2d 866 (1941); Brown v. Karas, 73 Ariz. 62, 237 P.2d 799 (1951).

In the case of Occidental Life Insurance Company of California v. Marsh, 5 Ariz. App. 74, 423 P.2d 150 (1967), review denied, this Court had under consideration a case which did not involve fraud but which did require proof by clear and convincing evidence. Therein we stated:

"* * * the rule in Arizona is that the return of service of process is impeached only by clear and convincing evidence. Whether that level of evidence

has been achieved so that the motion to vacate judgment will be granted is for the discretion of the trial court."

■ Arizona has long recognized that there are nine essential elements of proof in a fraud case and that if any one element is not established by clear and convincing evidence, there can be no recovery based upon the claimed fraud. The nine elements are:

(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his injury.

Some of the cases reciting the nine elements of fraud are, Packard Phoenix Motor Company; Mutual Benefit Health and Accident Association v. Ferrell, 42 Ariz. 477, 27 P.2d 519 (1933); Rice; Brown; Gibraltar Escrow Company v. Thomas J. Grosso Investment, Inc., 4 Ariz.App. 490, 421 P.2d 923 (1966).

■ A single material fact may be sufficient to establish fraud. In the case of Sult v. Bolenbach, 84 Ariz. 351, 327 P. 2d 1023 (1958), the Supreme Court stated:

"A party is not required to prove that all the specifications of fraudulent representations are true; a single representation of material fact upon which the party had a right and did rely to his damage is sufficient to afford relief."

A partial investigation by the party who urges that fraud has been practiced upon him does not, in all instances, negative reliance. Mayo v. Ephrom, 84 Ariz. 169, 325 P.2d 814 (1958). In Sult, the Supreme Court cited Mayo and stated:

"In our recent case of Mayo v. Ephrom, supra, we recognized that where only a partial investigation is made and a party relies in part upon the representations and is deceived by such representations, the action may be maintained."

Actual fraud may be shown where the party misrepresented a material fact intentionally or by design. Brazee v. Morris, 68 Ariz. 224, 204 P.2d 475 (1949). In Brazee, quoting an earlier Arizona case, our Supreme Court stated:

> "In Harrison v. Roark, 31 Ariz. 73, 250 P. 367, 368 we defined actual fraud in these words: 'When the party intentionally, or by design, misrepresents a material fact, or produces a false impression in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage over him, in every such case there is a positive fraud, in the truest sense of the terms.' Willink v. Vanderveer, 1 Barb., N.Y., 599, 607."

The greatest hurdle facing a person who seeks to establish fraud in relation to the eighth essential, namely, "his right to rely thereon", where the person has signed a document, is the signing of the document without first reading the writing. Where the person was not precluded from doing so, his claim of fraud has been criticized by the Arizona Supreme Court. In Mutual Benefit, the Supreme Court recognized that one who admits that he entered into a contract,

> "* * * may defend on the ground that his consent thereto was obtained through fraud, for fraud vitiates all transactions into which it enters."

The Court then discussed the effect of the signed document in relation to the right to rely on the alleged representations, where the party pleading fraud signed the document without reading it and without it having been read to him. The Court further stated:

> "* * * That element is his right to rely upon the alleged representations. * * * without reading it or without its being read to him he did sign it.
>
> "* * * It is the general rule that false representations are not actionable unless the hearer was justified in relying thereon in the exercise of common prudence and diligence. (citing cases)

What is common prudence and diligence varies in accordance with the circumstances of the case, but it is generally held that, when a party has an equal opportunity to read and examine a contract with the other party, it is his duty to do so, and, if he fails, he will not be permitted to avoid it on the ground that he did not read it or supposed it was different in its terms from what it really was. * * *"

In the Supreme Court's decision In Re McDonnell's Estate (Cleveland v. McDonnell) 65 Ariz. 248, 179 P.2d 238 (1947), we find the following statements:

> "* * * the appellee was guilty of gross negligence in not reading this instrument before she signed it. * * * The instrument itself is short, * * * There is neither allegation nor proof of any attempt on the part of the appellant to prevent the appellee from reading the document. * * *
>
> "Because under the facts in the instant case, the negligence so outweighs the fraud, the court is not faced with a reexamination * * *."

■ The appellants strongly rely on Mutual Benefit. In the case before us, the evidence established a written representation of "Very low mileage" in the form of a newspaper advertisement. The plaintiff sought the car described in the advertisement and was shown the car in question. The defendant's agent, Milner, acknowledged that low mileage is a material factor with at least 50% of the car buyers. Evidence which the jury and the trial judge believed to be clear and convincing established that somehow, notwithstanding the protestations that speedometers are not turned back by the defendant, a mileage reading in excess of 80,000 miles on 20 November became a mileage reading of 22,836 miles on 9 December. Under these circumstances we hold that the triers of the fact were justified in finding a right to rely notwithstanding the portions of the writing heretofore quoted and signed by the plaintiff.

The appellants urge error in the trial court's refusal to give appellants' Requested Instructions 8 and 9. These instructions state in substance that if the jury believed from the evidence that the plaintiff read or had the opportunity to read the contract, then he was bound thereby and a verdict should be for the defendants. The evidence disclosed the plaintiff's opportunity to read. There was no fact issue in this respect. The giving of these instructions, or either of them, would have been tantamount to instructing a verdict in favor of the defendants. The same proposition of law was urged upon the trial court and rejected by the trial court both at the close of the plaintiff's case and at the close of all of the evidence by the trial court's denial of the motions for an instructed verdict. Under the facts of this case we find no error.

The appellants' Requested Instruction No. 5 was modified by striking a portion thereof and was given as modified. It is urged that the modification was error. As given, the instruction defines the term "clear and convincing". The portion which was stricken, reads as follows:

> " 'Clear and convincing' is a higher degree of proof than is required under the ordinary rule of preponderance of the evidence, but it is not as high a degree of proof as is required in a criminal case where guilt must be established beyond reasonable doubt."

The instruction did not define the term "beyond reasonable doubt". We cannot presume that the jury was familiar with the correct definition of this term, a term which is redefined in each criminal case even though all members of the particular jury may have served upon other criminal cases. An examination of the instructions discloses proper definitions of "preponderance of the evidence" and "clear and convincing". We find no error in the action of the trial court in eliminating the above language from the requested instruction.

The appellants further urge that it was error to submit a form of verdict allowing the jury to assess punitive damages and that it was error to permit a recovery for punitive damages. The instructions properly set forth the test in Lufty v. R. D. Roper & Sons Motor Co., 57 Ariz. 495, 115 P.2d 161 (1941), that:

> " * * * punitive damages should not be allowed, unless the conduct of the wrongdoer is wanton, reckless or shows spite or ill will."

In our opinion, a reading of the record supports the jury's award of punitive damages.

The judgment is affirmed.

CAMERON, C. J. and DONOFRIO, J., concur.