# THOMASSEN LINCOLN-MERCURY, INC. *v.* HENRY ROMERO GOLDBAUM

[No. 914, September Term, 1979.]

*Decided April 14, 1980.*

The cause was argued before Liss, WILNER and WEANT, JJ.

*Rourke J. Sheehan,* with whom was *Patrick L. Woodward* on the brief, for appellant.

*Walter H. Madden,* with whom was *Harold C. Smith, Jr.,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

One day, near the end of September, 1975, John Booher walked into the showroom of Thomassen Lincoln-Mercury, Inc., in Rockville, saw a sporty new Lincoln Continental that he thought his wife might like, and agreed to buy it. Everything was all arranged, except that he was told by the salesman and sales manager that he would be unable to take delivery until October 4, 1975.[1]

Booher returned on October 4, completed all the paperwork, and took delivery of the car. The window sticker, containing the relevant price information, showed the "list" price to be $10,305.50. The actual price paid by Booher was $2,000 less. The documents evidencing the sale show a selling price of $8,305.50, plus $391.50 for taxes, tags, and credit life insurance, or a total of $8,697.00. Booher made a down payment of $3,697 and financed the balance via an installment sale agreement under date of October 6, 1975.

When he took delivery of the car, Mr. Booher received a temporary registration certificate showing him and his wife as purchasers. He also received an "Ownercard" with his name on it and an Owner's Manual. As Mr. Booher was

---

1. The salesman explained that Ford Motor Co. gave a rebate to Thomassen on cars that remained unsold by a particular date, that date apparently being October 4 or a day or two earlier. If the car were delivered before October 4, Thomassen would not get the rebate; if delivered on or after October 4, Thomassen would have the sale and also get the rebate. Ford has not seen fit, in this case, to complain about that procedure.

buying the car for his wife, he went through the Owner's Manual and underlined a number of passages in it with a green felt pen to call them especially to her attention.

From the beginning, Mr. Booher experienced trouble with the car. It overheated when he drove it home from the Thomassen showroom. The next day, he drove it to Thurmont (from Wheaton), and it again overheated. On October 6, 1975, he took it back to the dealer, but was told that "it was the new Ralph Nader attachments that made the car hot." After additional episodes of overheating, Booher returned the car again on October 14, 1975. As he was explaining the problem, the wiring suddenly caught fire, damaging not only the wiring but also the air conditioner. Thomassen replaced the wiring and the air conditioner motor, the repair invoice of October 16, 1975, showing the mileage on the car then to be 276.

At this point, Booher said that he no longer wanted the car. Through the sales manager, George Parker, Thomassen agreed to take the car back and refund all but $300 of the money Booher had paid. As to the $300 deduction, Booher said: "I was told that they could not, *that they would have to sell the car back as a used car* and they could not give me any more money back for the car than that amount." (Emphasis supplied.) After Booher executed a release, Parker "did at that time tell me and for the first time that the car would be put back in stock and sold *as a new car.*" (Emphasis supplied.)

Curiously, a month later, Booher received a letter from George Thomassen, President of the dealer company, congratulating him for purchasing the car. Some time later, he received a card from Ford Motor Company reminding him that it was time for the 10,000-mile checkup.

On November 20, 1975 — a month after Mr. Booher returned the car — Henry Goldbaum wandered into the Thomassen showroom looking for the car of his dreams, and, lo and behold, saw the selfsame Continental. He noticed that the odometer registered 375 miles, that the Owner's Manual was marked up, and that the Ownercard had Mr. Booher's

name on it. He inquired about these things of one Larry Epstein, a salesman for Thomassen, and was told that (1) the car was new and had not been previously owned, (2) the mileage came from driving the car back and forth from a storage lot and from "demonstration" rides, (3) *Epstein* had marked up the Owner's Manual in order to call attention to the important things, and (4) the car had been sold before but the deal had fallen through, which explained why Mr. Booher's name was on the Ownercard. These explanations seemed reasonable to Goldbaum and he accepted them. Goldbaum noticed that the price information, required by Federal law (*see* 15 U.S.C. §§ 1232, 1233) to be attached to the window was missing; but he did not question the omission.

Goldbaum had a 1973 Volvo to trade. Epstein had it appraised and offered Goldbaum the Continental for the Volvo plus $5,000. Goldbaum accepted and the deal was closed on that basis. The invoice described the vehicle as new and showed a purchase price of $10,600.50 plus tax and tags of $354, or a total of $10,954.50. Of this, $5,606.50 was allocated to the trade-in and Goldbaum paid $5,348 in cash. Goldbaum was never told what his Volvo had been appraised for and didn't care. He was interested only in how much cash would be required and was delighted to learn that it was an amount he could afford. Like Booher, Goldbaum received a temporary registration permit.

In one of those rare "it's a small world" coincidences, Mr. Booher spotted the Continental as he was driving somewhere one day in December, 1975. He followed the car onto a post office parking lot, checked the serial number on the top of the dashboard after the car was parked, and waited for its driver to return. The driver was Mr. Goldbaum; and Booher not only told him of his prior interest in the car but showed him the invoice and other documents he had received from Thomassen pertaining to it. Goldbaum, Booher said, "was dumbfounded." He was "like a man that has just attended a funeral of his very best friend."

At the time, Goldbaum had been having no trouble with

the car, and thus made no complaint to anyone about the apparent deception. In 1977, however, he moved to Frederick, and had to commute between there and his employment in Wheaton. This provided the first opportunity to drive the car any long distance, and he then began to notice that it overheated. He ultimately replaced the radiator, but still made no complaint to Thomassen. Its first indication that Goldbaum was dissatisfied came sometime in November, 1977, when the sheriff delivered a copy of Goldbaum's multi-count Declaration charging it with breach of contract and fraud.

After trial in the Circuit Court for Montgomery County, the jury was permitted to consider whether Goldbaum had, on the evidence recounted above, made out a case of actionable fraud.[2] The jury believed he had, and accordingly returned a verdict in Goldbaum's favor for $37,000 — $2,000 compensatory damages and $35,000 punitive damages. After some post-trial proceedings, the court "ordered" a remittitur of $15,000 in the punitive damage award and ultimately entered judgment for $22,000. Thomassen, feeling aggrieved, appeals, raising the following issues:

> "I. Did the Court err in not directing a verdict for appellant due to insufficient evidence as to allegations that defendant was liable for fraud in misrepresenting (a) that the car in question was new, (b) that the mileage on the odometer resulted exclusively from the car being moved on the lot, and (c) that it had no previous owner?

> "II. Was there sufficient evidence of scienter to warrant the Court's allowing the jury to consider the alleged misrepresentation that the vehicle was new?

> "III. Did the Court err in not directing a verdict in favor of appellant due to insufficient evidence of pecuniary damages directly caused by the alleged misrepresentations?

---

**2.** Directed verdicts on the other counts were entered in favor of Thomassen.

"IV. Did the Court err in permitting the jury to reach the issue of punitive damages when there was insufficient evidence of outrageous conduct apart from the fraudulent misrepresentation itself?

"V. Was it error for the Court to refuse to instruct the jury that it must consider the statutory definition of new vehicle in determining whether the appellant made a knowingly false representation that the vehicle was new?

"VI. In view of the fact that appellee failed to accept the remittitur within the time prescribed by the Court's ruling, should the case be remanded for a new trial?

"VII. Was it error for the Court to refuse to grant a new trial on the ground of newly discovered evidence?

"VIII. Did the Court err in refusing to permit the testimony of the Director of Licensing and Consumer Services for the Motor Vehicle Administration?"

### (1) *Sufficiency of the Evidence: Fraud*

The first three issues raised by appellant may be considered together. They question whether the evidence sufficed to show one or more of the required elements of actionable fraud — whether, in other words, the court erred in denying the motion for directed verdict.

In order to recover under his fraud count, it was incumbent upon Mr. Goldbaum to prove: (1) that a representation made by appellant was false; (2) that its falsity was known to appellant or that the representation was made with reckless indifference as to its truth or falsity; (3) that the representation was made for the purpose of defrauding Mr. Goldbaum; (4) that Goldbaum not only relied upon the misrepresentation, but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and (5) that Goldbaum suffered an injury directly resulting from appellant's

misrepresentation that is subject to being redressed by compensatory damages. *See James v. Weisheit,* 279 Md. 41 (1977); *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532 (footnote 5) (1976).

The test for determining the sufficiency of evidence necessary to overcome a motion for directed verdict in civil cases has been stated many times. In considering a motion for directed verdict, both the trial court and, on review, the appellate court,

> "assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom, and considers them in the light most favorable to the party against whom the motion is made.... If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied."

*Impala Platinum v. Impala Sales,* 283 Md. 296, 328 (1978).

In this appeal, appellant attacks the evidence as to elements (1), (2), and (5): falsity of the representation, knowledge of the falsity, and actual resulting damage. We find that the evidence was more than sufficient to establish these elements.

The relevant representations were that the car was new and had not been previously owned. Goldbaum's testimony certainly sufficed to establish that these representations were made. Appellant does not seriously contest that. Its claim is that the representations were not shown to be false. It bases this assertion upon the fact that the Booher deal was annulled before the car had actually been titled in his name by the State Motor Vehicle Administration, that the car, at all times prior to the sale to Goldbaum, thus remained titled in appellant under a manufacturer's certificate of origin, and that it was sold to Goldbaum on the manufacturer's

certificate of origin. Relying then upon the definition of "new vehicle" in Md. Ann. Code, Transportation article, § 11-138, and the procedures set forth in § 13-104.1 of that article for obtaining a certificate of title for a "new vehicle," appellant contends that, when sold to Goldbaum, the car was in fact "new" and had not been previously owned.

This interesting argument rests upon a strained and inappropriate construction of the statutory definition of "new vehicle," however. Section 11-138 defines "new vehicle" as a vehicle:

> "(1) The owner of which is a manufacturer, distributor, or licensed dealer; *and*
>
> (2) *That never has been used to destroy its newness or to convert it into or make it a used or secondhand vehicle, as these terms are commonly used or understood in trade or business."* (Emphasis supplied.)

Expert testimony is hardly necessary to permit a fair and rational inference that a car that has been previously sold, previously driven by the person who bought it for a period of nearly two weeks, and previously damaged by fire "has been used to destroy its newness" and has been converted into a "used or secondhand vehicle, as these terms are commonly used or understood in trade or business." The fact that an MVA certificate of title was never issued to Mr. Booher may be relevant in terms of how MVA processed the subsequent transfer to Mr. Goldbaum, but it cannot erase or detract from the far more significant circumstance that the car was in fact previously sold, previously used, and previously damaged. The evidence supplied by Mr. Booher more than sufficed to establish the falsity of appellant's representations.[3]

The same evidence also suffices to establish that the misrepresentation was a knowing one. Clearly, the sales manager was aware of the Booher transaction; and Epstein, the salesman with whom Goldbaum dealt, knew full well

---

**3.** We note especially, in this regard, the ruse employed to extract an additional $300 from Mr. Booher — telling him that the car would have to be sold *as a used car.* Thomassen can't have it both ways.

that his responses to Goldbaum's inquiries about the Ownercard and Owner's Manual were absolutely untrue.

Turning now to the question of compensatory damages, the list price of the car, as sold to Goldbaum, was $10,600.50 (nearly $300 more than the price paid by Mr. Booher two months earlier, when the car was really new). William Brewer, offered by Goldbaum and accepted by the court as an expert witness, testified that the fair market value of the Continental when sold to Goldbaum was $6,550. This was based upon the hypothesis that the car had been previously sold, driven 375 miles, had a fire under the hood, and had continuing overheating problems. This would, if believed, certainly support the jury's determination that Goldbaum suffered $2,000 (or more) in actual pecuniary loss.

Appellant's attack on this is a multiple one. It challenges Mr. Brewer's status as an expert witness as well as the validity of his opinion. Extended discussion is unnecessary. Given Brewer's extensive background and familiarity with automobile values derived from 13 years experience as a bank officer involved in making auto loans, the court was well within a proper exercise of its discretion in qualifying him as an expert. Appellant's complaints about the manner in which Brewer derived and stated his opinion as to value go to the weight to be accorded his testimony rather than to its admissibility.

(2) *Sufficiency of the Evidence:*
*Punitive Damages*

The Court of Appeals made clear in *Wedeman v. City Chevrolet Co., supra,* 278 Md. 524, that punitive damages are recoverable in an action of fraud where "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others" is evident. *Id.* at 532. Appellant acknowledges *Wedeman,* but, by taking certain language in the Opinion wholly out of context, ascribes to it a meaning that was neither intended nor warranted.

Mrs. Wedeman purchased a "new" demonstrator from City Chevrolet upon the express assurance that it had never been involved in an accident or damaged in any way. A week

later, the car was in an accident, and, as a result, Mrs. Wedeman learned that the car had been involved in a *prior* accident, *i.e.,* that the dealer's representation had been a false one. She returned the car to City and requested that it repair all the damage. City refused unless she agreed to retract her assertion that the car had been previously damaged. Ultimately, the car was repossessed by the bank to which City had assigned its security agreement for the deferred purchase price.

Reversing a contrary determination by this Court, the Court of Appeals first made clear that the fraud involved did not *arise* from a contractual relationship but rather *induced* that relationship, and thus the test for determining the allowance of punitive damages was "implied" malice (wanton or reckless disregard), not "actual" malice as defined in *H & R Block, Inc. v. Testerman,* 275 Md. 36 (1975). That aspect of the case is not at issue here.

Turning then to an analysis of the "implied" malice test, the Court regarded as the "Maryland rule" that which it had said in *Russell v. Stoops,* 106 Md. 138, 143-44 (1907):

> " 'In ordinary cases the recovery of exemplary, punitive, or vindictive damages will not be allowed in an action of deceit; but such damages may be allowed where the wrong involves some violation of duty springing from a relation of trust or confidence, *or where the fraud is gross,* or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfulness. . . .' " (Emphasis supplied.)

Drawing from this statement, the Court continued, at p. 530-31 of 278 Md.:

> "The Maryland rule on this point accords with the weight of authority elsewhere, which generally holds that to recover punitive damages in actions of deceit, an element of aggravation, evidenced by malicious, deliberate, gross or wanton conduct, sometimes called implied malice or the legal

equivalent of actual malice, or legal malice, *must accompany the fraud.*" (Emphasis supplied.)

Punitive damages, noted the Court, are awarded "to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct. . . ." In that regard, they are more likely to serve their deterrent purpose in a fraud case than in most other instances of tortious conduct. "Those who are tempted . . . to engage deliberately in fraudulent conduct for profit are more likely to pause and consider the consequences if made aware that they may be compelled to pay more than the actual loss sustained by the plaintiff." *Id.* at 532.

Looking then to the facts before it, the Court observed that "[w]holly apart from the fraudulent misrepresentation itself, there was evidence of outrageous conduct on appellee's part, which could be characterized as a wanton or reckless disregard for appellant's rights" (p. 532), this being the dealer's intransigence concerning the repairs. "This conduct," the Court held "coming on the heels of the fraudulent misrepresentation itself, was sufficient to support the recovery of punitive damages."

Appellant seizes upon these last observations as constituting a *requirement* that the wanton or reckless conduct be "wholly apart from the fraudulent misrepresentation itself" — *i.e.,* that the fraud itself cannot support an award of punitive damages no matter how outrageous, wanton, or reckless are the acts making up the fraud. We do not read *Wedeman* as establishing any such principle. *In that case,* the outrageous conduct, though obviously related to the actual misrepresentation, was nevertheless somewhat extraneous to it, and the Court's language must be read in the context of what was then before the Court. That particular language was neither used nor intended to express a broad principle of law, but only an application of the principles enunciated earlier in the opinion to the case then at issue.

This is particularly apparent from the fact that, in support

of its statement of what it truly considered to be the "Maryland rule" (*see ante*), the Court, in footnote 4, 278 Md. at 524, cited a number of cases expressly permitting punitive damages in deceit actions against automobile dealers where the outrageous or wanton conduct was in the fraud itself, and not in any extraneous action. *See, for example, Beshears v. S-H-S Motor Sales Corporation,* 433 S.W.2d 66 (Mo. 1968) (representation that car was a demonstrator on the road for 27 days when in fact it had been previously sold, used for three months, and repossessed); *Otte v. Ron Tonkin Chevrolet Co.,* 503 P.2d 716 (Or. 1972) (car represented as salesman's personal car never sold to anyone else, had actually been sold twice before and repossessed); *Madisons Chevrolet, Inc. v. Donald,* 505 P.2d 1039 (Ariz. 1973) (car had been previously damaged, odometer turned back).

These, and other, cases make clear that the outrageous conduct justifying punitive damages not only *may* be, but usually is in the fraud itself. *Wedeman* was the unusual case. *See,* in addition to the aforecited cases, *Capitol Dodge, Inc. v. Haley,* 288 N.E.2d 766 (Ind. App. 1972, also cited by the Court in *Wedeman*); *Boise Dodge, Inc. v. Clark,* 453 P.2d 551 (Ida. 1969); *King v. O'Rielly Motor Company,* 494 P.2d 718 (Ariz. 1972); *Sarwark Motor Sales, Inc. v. Husband,* 426 P.2d 404 (Ariz. 1967); *Osborn v. Gene Teague Chevrolet Company,* 459 P.2d 988 (Or. 1969); *Lewis v. Worldwide Imports, Inc.,* 395 P.2d 922 (Or. 1964); *McGill v. Huling Buick Company,* 487 P.2d 656 (Or. 1971); *New and Used Auto Sales, Inc. v. Ahvakana,* 269 F.2d 189 (9th Cir. 1959); *cf. Bryan Constr. Co., Inc. v. Thad Ryan Cadillac, Inc.,* 300 So. 2d 444 (Miss. 1974). *See also* Restatement of Torts 2d § 908, and Comment b. thereto; Anno., *Sale — Used Automobile — Warranty,* 36 ALR3d 125, 226, *et seq.* Compare *Dassing v. Fred Frederick,* 240 Md. 621 (1965), and *Schwartzbeck v. Loving Chevrolet,* 27 Md. App. 139 (197S), denying punitive damages where a defrauded plaintiff failed to prove any compensatory damage.

This is not to say, of course, that all conduct amounting to actionable fraud warrants punitive damages. That is clearly not the law. It is arguable, of course, that any conduct

sufficient to satisfy the five-part test established by the Court of Appeals for fraud (*see Wedeman,* footnote 5, 278 Md. at 532, and *ante* herein) connotes some degree of either wantonness or recklessness. And, to the victim, any such conduct would surely be regarded as outrageous. To that extent, it becomes a matter of degree — a degree that is difficult to define in the abstract, but which courts have had little problem ascertaining in the context of actual cases.

The overwhelming authority, as evidence by the aforecited cases, is to the effect that when an automobile dealer knowingly and deliberately engages in the type of conduct apparent in this case — patently lies to the customer in response to pointed and material questions about the condition of the car — the dividing line between ordinary fraud and outrageous, wanton, or reckless conduct has been approached sufficiently to permit the issue of punitive damages to be submitted to the trier of fact.

If, as the *Wedeman* Court (and nearly every court addressing the subject) has said, the purpose of punitive damages is "to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct . . .," we can think of no more appropriate case for such a lesson than this one. Appellant and its agents knew full well the history of this car, and yet they not only passively concealed it from Mr. Goldbaum but deliberately lied to him about it — a string of lies, one after the other. The contradictory statements made to Mr. Booher — exacting a forfeiture of $300 on the premise that the car would have to be resold as a used car and then telling him it would be put back in stock as new — confirm the deliberate, wanton, and outrageous nature of the fraud practiced on Mr. Goldbaum.

### (3) *Statutory Definition of "New Vehicle"*

We shall here deal with appellant's fifth and eighth issues.

Appellant's principal defense, as noted above, was that, under the definition of "new vehicle" in § 11-138, the car was "new" when sold to Mr. Goldbaum. We have already expressed our view of that argument.

In support of it at trial, appellant called two other automobile dealers — Jerry Cohen, of Jerry's Ford in Annandale, Virginia, and Larry Larsen, of East West Lincoln-Mercury — who stated that they too considered a car as new until MVA issued a certificate of title. Indeed, Mr. Larsen opined that the car would still be new even if driven 10,000 or 20,000 miles. Following these witnesses, appellant called Nance Stamboni, an employee of MVA, and, upon appellee's objection, indicated its intention to question her as to what she considered a new car to be based upon the statutory definition. The court refused to permit such testimony, which forms the basis of appellant's eighth complaint.

In its instruction to the jury, the court read the statutory definition, told the jury that it may consider that definition, but cautioned that the definition "is only given to you to assist you in arriving at your determination and is not intended to be binding upon you in any way." Appellant excepted to the court's refusal to instruct that the jury "must" consider the statutory definition.

We find no error in either of the court's actions. Ms. Stamboni was called to give her interpretation of the statute — i.e., essentially a legal opinion. But it was not proffered that she is a lawyer or trained in the law. It was evident that she would be asked to state an opinion based upon how MVA, for its purposes, construed the statute, which may have little relevance to what the consuming public would consider to be new or used. In this context, we do not believe that the court abused its discretion in refusing to permit such testimony.

The same principle applies with respect to the jury instruction. The statutory definition in the Vehicle Laws was certainly relevant, but is not necessarily controlling in a private action for fraud.

### (4) *Acceptance of the Remittitur*

On March 12, 1979 — five days after the jury rendered its verdict — appellant moved for judgment N.O.V. or, in the alternative, a new trial or a remittitur. After a hearing, the

court, on June 4, 1979, ordered a remittitur reducing the punitive damages from $35,000 to $20,000. This apparently was done orally. The docket entry shows, for June 4, "Court (Fairbanks, J.) directs a Remittitur, reduces punitive damages from Thirty-Five ($35,000.00) Thousand Dollars to Twenty Thousand ($20,000.00) Dollars. Ms. Hatcher reporting."

On June 7, there is another docket entry that reads, "Correction of Docket Entry per Judge Fairbanks: Court (Fairbanks, J.) will order remittitur to $20,000.00. If plaintiff does not accept within 10 days from June 7, 1979, Court will grant new trial, no reporter present." That same day, counsel for appellee wrote to counsel for appellant asking whether appellant would "pay the remittitur if it was accepted" and pointing out that "this would be important to know in making a determination on the remittitur." On June 13, appellant's counsel responded to the letter but did not answer that question.

On June 27, 1979, the court issued the following order:

> "Upon consideration of the issues raised in the Defendant's Motion for New Trial and the Court having determined to grant a Remittitur of $15,000.00 from the $35,000.00 punitive damages jury award or, in the alternative, to grant a new trial as to damages, and, upon further consideration of the Plaintiff's willingness to remit $15,000.00 in punitive damages, it is thereupon this *27* day of June, 1979, by the Circuit Court for Montgomery County, Maryland
>
> "ORDERED, that Plaintiff is awarded a money judgment in the amount of $22,000.00 consisting of $2,000.00 in compensatory damages and $20,000.00 in punitive damages, and it is further
>
> "ORDERED, that the Clerk of the Circuit Court is directed to enter a judgment absolute for the Plaintiff, Henry Romero Goldbaum against the Defendant, Thomassen Lincoln-Mercury, Inc. in the total amount of $22,000.00 plus costs of these proceedings."

This is the order from which appellant has appealed. It was written on stationery of appellee's counsel, and we may presume, therefore, that it was prepared and submitted to the court on behalf of appellee. Appellee has not filed a cross-appeal from the order and seems perfectly content with the judgment.

Appellant claims that, because appellee never formally accepted the remittitur, a new trial should have been granted. The evidence is clear, however, that the remittitur was, in fact, accepted; and if it was not accepted within 10 days of June 7, it is apparent that the court extended the grace period, as it had a right to do.

### (5) *Newly Discovered Evidence*

In furtherance of its principal line of defense, appellant subpoenaed certain records from MVA, among which was the Manufacturer's Statement of Origin and its assignment to Mr. and Mrs. Goldbaum. Pursuant to that subpoena, MVA delivered a rather poor photocopy of the document, which was put into evidence by appellant. The assignment is on the reverse side of the Statement of Origin, and it appears that, on the copy placed in evidence, some of the dark printing on the front side was visible on the reverse side. As a result, the line on the assignment side whereon the names of Mr. and Mrs. Goldbaum are typed is somewhat clouded. If one looks at the copy of the assignment, as put into evidence, it might appear that something else had been typed on that line and erased.

Indeed, in his closing argument, counsel for Goldbaum said to the jury, "You folks take a look at Defendant's Exhibit Number 3 when you are back there and you look at this first assignment. Look at it. See if it doesn't appear to you that someone else's name was in there first on the Certificate of Origin. *You draw your own conclusions from that document.*" (Emphasis supplied.) No objection was made to that statement.

In connection with its new trial motion, appellant obtained an affidavit from the MVA microfilmer to the effect that the shading was in fact from the printing on the face

side and not from any erasures. It claimed that this was "newly discovered" evidence, sought a new trial on that basis, and complains that the court rejected its entreaty.

The court was well within its discretion. This was not newly discovered evidence. It was a feature of appellant's own exhibit. Had counsel, or his client, examined the subpoenaed document carefully, he would have seen the shading. The trial lasted three days. The problem could have been resolved before the unclear document was placed into evidence.

*Judgment affirmed; appellant to pay the costs.*